Good morning, Your Honors. Good morning, Chief Judge Smith. May it please the Court, my name is John Fabian. I represent the appellate, James Sharbono. In his appeal of the District Court's order dismissing his reasonable accommodation claims under the Americans with Disabilities Act and the Minnesota Human Rights Act, we are asking this Court to reverse the District Court's order dismissing those claims and vacating the judgment. It is our position that the District Court, when it determined as a matter of law that no reasonable jury could conclude NSP did not make a good faith effort to accommodate Mr. Sharbono. There is substantial evidence in the record that would allow a reasonable jury to conclude the opposite. And I am going to provide the Court with several pieces of that evidence of NSP's lack of good faith. One, NSP ignored OSHA regulations for protective footwear that allow an employer to certify that protective footwear is at least as effective as the protective footwear constructed in accordance with one of the consensus standards including ASTM 2413. What happened, just step back here for a second, so NSP's Vice President of Human Resources, Darla Fugoli, this is late 2012, she asked the Manager of Disability Solutions, Betty Post, to investigate whether it would be possible to provide Mr. Sharbono with a safety boot that would help him return to work. That was Ms. Fugoli's charge and that was Ms. Post's task. And Ms. Post recognized that that job was to see whether there was a reasonable accommodation for OSHA compliant protective footwear. The problem with what happened here was NSP essentially ignored the regulations that I've identified and focused instead on providing Mr. Sharbono only with a boot that could be stamped with the ASTM stamp. Well, what they wanted was a boot that would qualify as being approved for the position that the appellate sought to hold, correct? That's correct. Mr. Sharbono was a lineman. He needed safety boots. They didn't have to be steel-toed safety boots. He had made requests in the past that he not be allowed or not be required to wear steel-toed safety boots. But the point here is that NSP had an inflexible policy. The inflexible policy was, if it's not marked with a stamp, you can't wear it. And that policy didn't make any particular sense in connection with Mr. Sharbono's case, primarily because Mr. Sharbono had worn those boots in the past. The boot that he'd worn in the past was the boot that cost him the injury. And the only way you get the stamp is if the boot is manufactured in a certified manufacturer's plant that places the stamp on the boot. The point here was that we're going to look for a custom boot that's compliant with OSHA, that doesn't require the stamp. NSP was fixated on the stamp. So despite meetings involving NSP legal counsel, corporate safety, and others, Betty Post never inquired how NSP could provide Mr. Sharbono with OSHA-compliant protective footwear that was not stamped. As further evidence of a lack of good faith, NSP failed to contact OSHA to ascertain whether non-ASTM stamped protective footwear could otherwise comply with OSHA regulations for protective footwear. They never made those inquiries. NSP did not obtain a prescription or order for making the custom boot for Mr. Sharbono. They had him see their doctor, Dr. Silverman. Dr. Silverman conducted an examination, essentially an IME, and he made a determination that Sharbono could perform the essential functions of his job, but he needed the custom boot that was compliant with OSHA. And what does the record show about identifying the boot not steel-toed that met the OSHA requirements? Actually, there is evidence in the record from a number of individuals. We have David Lewis from Minnesota Prosthetics and Orthotics. That's a company that is owned by the employer of Dr. Silverman. He told Betty Post that an ASTM-compliant boot could be made. We have the testimony of Paul Casanova. But didn't they later say it couldn't be? No, Mr. Lewis never said it couldn't be. Mr. Lewis was the person that told Betty Post that he had contacted boot manufacturers and he was told that they could create a custom boot that was ASTM-compliant. That's one of the other factors with respect to the lack of good faith on the part of NSP. Your Honor, you're probably referring to Scott Langston. And so after Betty Post had her one conversation with Scott Langston, and Langston told Betty Post that the boot could be made but they can't stamp it, Betty Post never went back to Mr. Lewis. That was her first point of contact. Well, I guess my question was, what does the record show as to whether a boot could be provided to Mr. Charbonneau that met the OSHA requirements? Yes, so we have Dr. Silverman just opined. He didn't say specifically, but you have Mr. Lewis said that a boot could be made and ASTM-compliant. But did anybody ever make a boot to show that other than theoretically that there really was a boot that would work? Well, that should have happened in this particular case, but that's one of the factors of bad faith. So after Betty Post had her one phone conversation with Scott Langston, and she didn't know anything about Mr. Lewis, she didn't know what her qualifications were to evaluate OSHA-compliant custom protective footwear. But after she had her one call with Scott Langston, she completely ended the interactive process. She didn't do anything else. That was it. So the boot should actually have been constructed, but that never happened because, again, there was this fixation on the ASTM stamp. The Director of Mr. Paul Jeske, he testified, and he was the Director from 2007 to 2015 during the time that this was all taking place. He testified that he had knowledge of the OSHA regulation that I quoted before, cited before, which allows for the use of protective footwear that the employer demonstrates is at least as effective as protective footwear constructed in accordance with any of the ASTM standards. He testified, despite his knowledge of this OSHA regulation, Mr. Jeske testified it was NSP's position not to consider for approval otherwise OSHA-compliant footwear that was not stamped. Specifically, he said, if it didn't have the ASTM stamp, it wasn't approved. That's a quote that comes from Appellant's Appendix, page 587. Is this in here? Was he offered any other position? No, and I'm sorry for the delay. I'm sort of moving along here. Yes, so the point here, by not engaging in the interactive process with Mr. Charbonneau after speaking to Langston, that was an additional piece of bad faith on the part of NSP. Ms. Post, it seems Ms. Post should have had a conversation with Charbonneau seeking his feedback as to the determination regarding the custom boot option and the reasons for that determination, that being that the boot can't be stamped. If Post would have talked to Langston, they could have had a discussion about Post contacting OSHA because Charbonneau testified, and there's evidence in the record, that he had talked to OSHA himself in the past and was told that OSHA did not require a stamp. He testified that he had urged several of his managers to contact OSHA themselves regarding that issue, but they never did. So the point here is that Post shut down the interactive process, never talked to Mr. Charbonneau, and the process ended. There's also evidence in the record that one of the things that NSP talked about doing was following up with another business called Elwood Safety. This is in the declaration of Karen Kumarkilo. Rather, it's in the Medgate notes. She spoke with the Job Accommodation Network, who also recommended that NSP contact Elwood Safety for foot and toe guards that go over existing shoes, but there's no indication that NSP ever did that. They never sufficiently explained to Mr. Charbonneau the 90-day job search. This was a discussion they had with him in October of 2012. They never told him what would happen at the end of the 90 days if he didn't find a job. That would have been a helpful discussion to have with him for purposes of engaging in the interactive process. When Ms. Post discontinued the interactive process, NSP never renewed the 90-day job search after concluding the boot wasn't an option. So there's another piece of a lack of good faith. There was another alternative suggested, and this is in the Kumarkilo declaration, part of that same call to the Job Accommodation Network. According to the network, if OSHA-compliant protective footwear cannot be found, the only other alternative was job reassignment. They never had that discussion with Mr. Charbonneau before the end of his employment. Our brief talks about the delay in the interactive process. Mr. Charbonneau got a new supervisor in October of 2011. He told her about the problems with his steel-toed boots, the pain that it caused, and Ms. McDermott didn't take any action to investigate any accommodation. I believe she said something to the effect, that's going to have to come from somebody higher up. Then we move into 2012. Nothing's being done to accommodate Mr. Charbonneau. He submits a letter from his doctor. How much of this time was he not at work during that period? You know, there was quite a bit of time when he could not work. He was using up his union benefit sick leave. Oftentimes, he was not at work because of the pain. One other example of a lack of bad faith is by failing to ensure that Mr. Charbonneau had properly fitted PPE. That's another requirement of the OSHA regulations. When Charbonneau was required to wear the steel-toed boots, NSP essentially didn't do what it was supposed to do under the law and to make sure that his PPE was properly fitted. I am going to reserve the rest of my time. You can continue if you like or reserve. I think I'm going to reserve. Thank you. Mr. Stenmo. Thank you, Your Honors. May it please the Court, my name is Greg Stenmo. I'm here on behalf of NSP and I have with me my partner, Emily Peterson. It's Mr. Charbonneau's obligation to show that he could have been reasonably accommodated. It's a complete defense if we show or if the practice at issue is required by federal law or the requested accommodation presents a threat to the health or safety of the employee or co-workers. A lineman's job is incredibly hazardous. It's one of the top 10 most dangerous jobs in the United States. And people are seriously hurt or killed virtually every day on the job trying to do their job. And trying to minimize serious injury or death is imperative as a matter of public policy. As a result, OSHA has set certain minimum requirements and NSP has to comply with those minimum requirements. Council talks about this inflexible policy of an ASTM stamp. Well, it's required by OSHA regulation. The regulation says the employer shall ensure that each affected employee use protective footwear. It says protective footwear must comply with any of the following consensus standards, which is the ASTM stamp. Now, they focus on this. Yes, Your Honor. Let me get this clear. The ASTM stamp and OSHA compliance are the same thing? Yes. Can you comply with OSHA without having ASTM's stamp? I don't believe you can. There's a clause in here that Mr. Charbonneau focuses on. It says protective footwear that the employer demonstrates is at least as effective as protective footwear that is constructed in accordance with one of the above consensus standards. They've not cited to any definitive ruling from OSHA or anybody else that says you can construct a boot that meets these consensus standards without the stamp. The logic is if it meets those consensus standards, you're going to get the stamp. And if it doesn't meet those consensus standards, you're not going to get the stamp. So we believe... Who gives the stamp? I'm sorry? Who gives the stamp? OSHA. In fact, we had testimony from one of the experts and also from Branier Orthopedics that said OSHA has to be present when those boots are being made in order to give them the stamp. And that's why it's an expensive, time-consuming, difficult process to go through this and get the stamp and to suggest that we could just walk into a manufacturer and say, give me a boot and stamp it, just as not supported by the record. And absent a ruling from a court or from OSHA saying, well, you can produce a boot without a stamp, what employer in their right mind would go off and say, okay, Mr. Charbonneau, here's a boot. We think that it's constructed in accordance with OSHA requirements, but we're not sure. And you can imagine the lawsuit that would happen if we would give him a non-stamped boot, he gets injured or killed, we were going to get sued. And they say, oh, well, that was your burden to show that it was constructed in accordance. And obviously it wasn't. It's a huge risk. It's a huge liability. So having an ASTM stamp, not only makes sense, it protects the employee, protects the company in accordance with OSHA standards. In fact, the EEOC in example 45 in talking about who's a qualified individual with a disability is almost identical to this case. It says, an employer pursuant to an OSHA regulation requires employees to wear steel-toed boots. An employee has severe burns on his feet and legs that prevent him from wearing these types of boots. The employer may insist that the employee wear steel-toed boots, and because the employee cannot comply with this rule, he is not a qualified individual with a disability. So even the EEOC recognizes our right to comply with our standard. NSP has the right to impose a safety standard. It's not higher than what OSHA requires. It is the standard. It's the minimum standard. And we even had the right to impose a higher standard if we wanted to, but we didn't. It's undisputed that our PPE policy requires an ATM stamp, and no one has cited anything to suggest that that's unreasonable. And just as good as they want us to latch on to, that exposes the company, exposes the employee, exposes everyone to risk. It's undisputed that wearing steel-toed shoes reduces the risk of serious harm or even death. It's undisputed that not wearing those shoes exposes the company and the employee to serious harm. And at the end of the day, Charbonneau has failed to meet his burden. As Your Honor noted, Judge Smith, this is only theoretical that this imaginary boot could have been created. No one has identified a manufacturer that says we can produce a boot with the ATM stamp that could be custom made. And clearly, there's no accommodation that would comply with OSHA or NSP's policy, safety policy, and we shouldn't have to compromise our safety standards to In a number of cases, the Roers case as well as the Khalil case that Your Honors were on, an employee is not entitled to the accommodation of their choice. And the employer has the right to impose certain safety standards. Go through the interactive process here to identify some accommodation. So it's his burden of proof to show that we didn't act in good faith. And good faith does not require exhausting every possibility. Good faith does not require us to make an accommodation that's perfect. Good faith does not require us to accept the employee's preferred or ideal. What did you do? I'm sorry? What did you do? Here's what we did. Over a period of five years, we had over 18 people working with Mr. Charbonneau, disability specialists, safety consultants, the vice president of human resources, management, workforce consultants. The union was involved. We had orthotists, neurologists, podiatrists, foot and ankle specialists. We had Red Wing Shoes. We had Georgia Giant involved trying to figure out how do we solve this problem. And none of them have been able to come up with a solution to solve the problem. In 2008, we recommended wool socks, diabetic socks, boots manufactured by Georgia Giant, steel toe overshoes. Mr. Charbonneau rejected all those things. We offered him light duty. We offered him four hours per day. We told him wrap your feet in gauze. He again rejected that opportunity. And the significant thing is he was able to wear Red Wing ASTM certified shoes for over three years without an incident. And then we fast forward to 2012 where he says, I want a complete waiver from this shoe requirement, this ASTM stamp shoe requirement. We gave him a lengthy leave of absence. We let him stay out for nine months after exhausting his FMLE leave. That was an accommodation. We paid him for the entire time that he was out on leave. That's an accommodation. We offered him light duty work. We told him you can apply for another job. Mr. Charbonneau rejected that opportunity saying, I don't want to, I like this job that I have. I want to keep this job. And then when he said, I don't want to apply for any jobs, we said, okay, we'll give you an opportunity to apply for disability retirement, another accommodation. And what's interesting about his disability retirement is that he gets paid for the rest of his life. It comes out of NSP's pocket. He gets paid not just to 65, but for the rest of his life. He can go get another job someplace else as long as it doesn't violate his disability retirement. You go the extra mile. We have him go see Dr. Silverman to see is there one last attempt that we can make to see if we can make this shoe for him. And Brainier Orthotics advises that no custom shoe meets the ASTM standard because someone has to watch the process for each individual custom shoe. At that point, we say there's nothing more that we can do. We've to accommodate this guy for five years. We've involved everybody we possibly can. He's refusing to do the things that we're suggesting that he does. He doesn't want to apply for any other jobs. And we finally say, okay, we'll put him on disability retirement and we'll pay him for the rest of his life. I think that fact alone that we put him on a disability retirement should be determined of good faith by itself. NSP had every economic incentive to find a way to keep this guy on the job, but they weren't able to do that. And the fact that he is now on permanent disability, we had to go through a process to determine that he was disabled, that he couldn't perform the central functions of his job. And Dr. Gorman concluded and confirmed that he is not able to perform the essential duties of his job. And he's on permanent disability. And interestingly, he continues, even after leaving work, he continues to suffer severe pain. In fact, there was some suggestion from one of the doctors that he probably will never be able to work again because of that foot injury. So the prospect of him coming back to the workplace is virtually zero. He's not going to have any damages because he's getting paid for the rest of his life. So this lawsuit is just really, really pointless. So we believe that Mr. Charbonneau has failed to establish that we didn't act in good faith. I don't think any reasonable jury could find based on this factual statement that we didn't do our obligation in terms of good faith. There's some... Why do you say he would have no damages? You think the disability retirement is equal to what he would make as an employee? Yeah, he's making about 50% of his pay level, but he's getting paid for his entire life. So if his working life would be through 65, and he's a young man, he's like 49 years old, so he's going to get paid for a significant period of time. So why do you think he would have no damages? Because at the end of the day, I think if you added up what he would have earned as a lineman and what he's getting paid for disability through the rest of his life would balance off. Would he have any kind of retirement with the company if he worked to age 65 and then retired? I don't know the answer to that question. I would assume there would be some sort of retirement. I don't know if they have a defined benefit plan or something you contribute to. But I think the damages issue isn't essential to the decision in this case. No, it's just you kind of threw it out there. Yeah, yeah, yeah. Basis for it. It sounds like you'd have to really run some numbers to see if your assertion is true. Yeah, the point is that I'm not sure what we're fighting about here because at the end of the... I assume he thinks he would do better as an employer. He wouldn't go through the lawsuit. But that's why I wondered how sure you were that it was a total wash. Okay, thank you. It was an observation. It's not essential because I think at the end of the day, no reasonable juror could find based on this set of facts. We worked with him for five years. We involved doctors. We involved disability experts to come up with this. And at the end of the day, what they're asking us to do is to ignore the ASTM standard, which OSHA has required and which we have as part of our policy. And he's failed to meet his burden to show that we could have come up with some magical boot. We still don't have it here today where we have some affidavit from a manufacturer that says, yes, I have a boot that complies with OSHA requirements and would allow Mr. Charbonneau, allow him to do this job. Because we found that even when we would make boots for him and have him try them out, well, they were unacceptable for whatever reason. He didn't want to do the gauze. He didn't want to do the socks, whatever it was. It was always inadequate for him. And we believe that he has totally failed to establish his burden of proof, that we failed to engage in the interactive process in good faith, and he's failed to establish that he could have been accommodated with reasonable accommodation. Just briefly, there's some comments about Dr. Silverman. Dr. Silverman admitted he wasn't an expert in footwear. In fact, he was not optimistic that Mr. Charbonneau would be able to perform his job functions even with custom footwear. Langston said he had no experience in creating custom safety toe boots like Mr. Charbonneau is required to wear. Franklin Darius merely speculates that, well, you don't have to comply with this OSHA requirement. Nobody, nobody has cited a case or an OSHA ruling that says you don't have to comply with the ASTM standard. And Paul Casanova that they've cited to, he's not a doctor, he's not an attorney, he didn't examine Charbonneau's foot. He didn't know for certain if a shoe could be constructed for him because he wasn't familiar with Mr. Charbonneau's unique injury. He wasn't an expert in whether a company could comply with the ADA or whether they could comply with the Minnesota Human Rights Act, and he wasn't an expert in OSHA footwear. Um, and then just quickly, uh, there's a recent case, McBee versus Team Industries from the Minnesota Court of Appeals from January 2008 saying that an employer, uh, the Minnesota Human Rights does not require an employer to engage in an interactive process to determine whether an appropriate reasonable accommodation is necessary. Thank you, Mr. Stinmo. Thank you, Your Honor. Mr. Fabian, your rebuttal. Um, as to Mr. Charbonneau's burden, uh, there is also evidence in a record that would allow a reasonable jury to conclude that Mr. Charbonneau could have been reasonably accommodated, but for NSP's lack of good faith. I previously mentioned the testimony of Paul Casanova. Mr. Casanova was the industrial sales manager for Chet's Shoes since 1993. They actually service NSP. NSP's been a customer for several years, and he was on that account. He, in fact, identified the manufacturers who could have constructed the custom boot. He identified two in his testimony. On cross-examination, when he was asked if the custom footwear in all those cases will meet the ASTM requirements, he testified, they have to, otherwise we won't sell them. That's at the, uh, Appellant's Appendix, pages 402 to 403. He also testified that NSP never contacted Chet's Shoes to find a safety toe solution for Mr. Charbonneau. As regards, uh, whether Mr. Charbonneau rejected all these accommodations that NSP claims that it offered, he actually tried the socks. He tried the gauze. He tried the overlays, the rubber overlays for his boots. He tried all those things. He wanted to work his alignment. That's what this case is about. That's why we're here. That's all he wanted to do. And NSP had the opportunity to follow the mandate that it was given to find an OSHA-compliant boot, and it didn't do that. Ms. Post made, she had one phone call with Scott Langston. Langston said, we can't stamp the boot. He said, the boot could be made. We can't stamp it. And at that point, she quit. With respect to the damages piece, I don't really think that's an issue for purposes of summary judgment, but I will say that the disability retirement is only 50% of what he was earning. It only includes base salary. It doesn't include all the overtime that he had worked his alignment when he was, when he was able to work his alignment. Just wanted to make that clear for the court. I have 29 seconds left, but I don't have anything further. If the court has any questions for me, I'd be happy to answer them. I see none. Thank you very much. Thank you, Mr. Fabian. Thank you also, Mr. Stenmoe. We will take your case under advisement and render decision in due course. Thank you.